**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| WHIRLPOOL CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. _____ |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| DAVIDE CABRI, | ) | |
| | ) | |
| Defendant. | ) | |

<u>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND OTHER RELIEF**</u>

Plaintiff Whirlpool Corporation ("Whirlpool"), by and through its undersigned counsel, brings this action to enforce its rights to recover the value of significant equity and cash incentive awards which Defendant Davide Cabri ("Cabri") is required (but has refused) to repay pursuant to the terms of the applicable plans governing such awards, and also to protect its valuable trade secrets from imminent misappropriation by Cabri, its long-time, high-level employee, and Cabri's prospective future employer, Candy Hoover Group S.r.l., a subsidiary of the global Haier Group ("Haier").  Whirlpool makes the following allegations in support of its claims.

**INTRODUCTION**

1.     Plaintiff Whirlpool is a global leading kitchen and laundry home appliance company.  Year after year, Whirlpool has brought new, enhanced, and innovative appliances to American and global households and thereby continuously improved life at home.  Whirlpool's legacy of innovation began 110 years ago when it developed the world's first electric wringer clothes washer in 1911.  In the succeeding century, Whirlpool has relentlessly built on that legacy: Whirlpool developed the first automatic washing machine in 1948; designed the food, waste-management, and personal-hygiene systems used in NASA's Gemini, Apollo, and Skylab programs in the 1960s and 70s; and became the world's first home appliance maker to commit to

greenhouse gas reductions in 2003.  Today, Whirlpool employs approximately 25,000 Americans, many more globally, and maintains 57 research and manufacturing centers in over a dozen different countries, each of which works seamlessly to bring smarter, more efficient, and more capable appliances to households around the world.

2.        Defendant Cabri was hired by Whirlpool over 32 years ago, in April 1989.  Cabri was first hired pursuant to a six-month training contract but promptly thereafter became a full-time employee who built a long-term career at the company.  In doing so, Cabri benefited from Whirlpool's culture of innovation and opportunity.  He consistently was promoted to more and more senior positions within the company.  In recent years, Cabri held positions at the one of the highest levels of Whirlpool's global product organizations.  For example, between March 2018 and July 2020, Cabri was the Global Platform Leader for Laundry—an approximately $6 billion business.  In that role, Cabri developed and implemented Whirlpool's Five Year Plan for Front-Load Laundry, managed Whirlpool's laundry product development, cultivated Whirlpool's laundry intellectual property, and oversaw Whirlpool's laundry product supply chain around the globe, including in the United States, Europe, Asia and Latin America.  More recently, Cabri was the Global Platform Leader for Built-In Cooking, including wall ovens, cooktops, built-in microwave ovens, microwave hood combinations, and vent hoods.  While in that leadership role, Cabri developed and implemented Whirlpool's Five Year Plan for Built-In Cooking, managed Whirlpool's cooking product development, cultivated Whirlpool's cooking intellectual property, and oversaw Whirlpool's cooking product supply chain around the globe.  Throughout his three decades with Whirlpool, Cabri has been based in Italy, but he has reported to superiors in the United States, managed multiple U.S. employees, and visited corporate and manufacturing facilities in the United States.

3.      In April 2021, Cabri informed Whirlpool leadership that he had accepted a high-level position leading the laundry product line at Haier, one of Whirlpool's chief competitors in the global laundry industry and the global home appliance industry more generally.  At Haier, Cabri reports that he will have profit and loss responsibility over Haier's laundry operations, at least in Europe and potentially on a more global basis.

4.      Whirlpool brings this suit to prevent Haier from wrongfully obtaining Whirlpool's trade secrets through its employment of Cabri.  Simply put, it will be impossible for Cabri to perform his new role within Haier's laundry division without misappropriating Whirlpool's trade secrets, particularly as they relate to Whirlpool's Laundry Organization.  Indeed, Whirlpool is informed and believes that Haier offered employment to Cabri precisely because it wants to exploit Cabri's deep knowledge of Whirlpool's trade secrets and corporate strategies—secrets and strategies that Cabri played an integral role in developing and effectuating on a global basis. Further, Whirlpool alleges on information and belief that, given the similarities in the job position that Cabri held at Whirlpool and the position Cabri is assuming at Haier, Cabri will invariably and inevitably use and exploit Whirlpool's trade secrets to Haier's benefit.  Whirlpool has advised Haier of the serious problems posed by its decision to employ Cabri in a position managing the laundry product line that is so similar to the one Cabri recently held at Whirlpool.  Whirlpool also has informed Cabri that his plan to leave Whirlpool for Haier and manage its laundry business comes with significant risks—not only to Cabri, but also to Whirlpool and Haier.  So, too, has Whirlpool explained to Cabri that he will owe Whirlpool well over $1 million in previously awarded equity and cash incentives should he leave for Haier.  Cabri has refused to acknowledge his obligation to repay Whirlpool for the incentive awards he received.

5.      In order to protect its legitimate and valuable interests, Whirlpool has no alternative but to seek relief from this Court, which has exclusive jurisdiction to address any issues or claims relating to the plans governing the equity and cash incentive awards Cabri received.  Only an order from this Court can ensure that Whirlpool recovers the amounts Cabri owes Whirlpool, and only an order from this Court can prevent Cabri and Haier from misappropriating Whirlpool's trade secrets.

## THE PARTIES

6.      Plaintiff Whirlpool Corporation is incorporated in Delaware and headquartered in Benton Harbor, Michigan.  Whirlpool is the sole owner of its subsidiary, Whirlpool EMEA S.p.A., based in Pero, Italy, just outside Milan, Italy.  Whirlpool EMEA S.p.A. has assigned to Whirlpool Corporation any rights, interests, and claims it has or may have relating to this action.  Unless context requires otherwise, subsequent references to "Whirlpool" include Whirlpool EMEA S.p.A.

7.      Defendant Davide Cabri is a citizen of Italy.  Cabri currently is employed by Whirlpool EMEA S.p.A., but reports to a supervisor in Michigan who is a member of Whirlpool Corporation's Executive Committee, reports to the CEO, and is employed by Whirlpool Corporation, and who supervises and manages many employees of Whirlpool Corporation in the United States as head of Whirlpool Corporation's Technology and Engineering group.  Cabri's Human Resources contact and resource is also a Whirlpool Corporation employee based in Michigan.  Furthermore, as discussed below, Cabri has routine and regular contacts in the United States, including regular travel to the United States (at least prior to the COVID-19 pandemic).

## JURISDICTION AND VENUE

**A.      Personal Jurisdiction.**

8.      This Court has personal jurisdiction over Cabri based on the exclusive forum selection clause Cabri agreed to when he accepted equity and cash incentive awards from Whirlpool pursuant to the terms of the plans governing such awards, including, but not limited to, Whirlpool's 2018 Omnibus Stock and Incentive Plan.[1]  When Cabri accepted those awards, he "irrevocably and unconditionally . . . submit[ed] in any proceeding relating to the [2018 Omnibus Stock and Incentive Plan] or any Award Agreement [under that Plan] . . . (a "Proceeding"), to the exclusive jurisdiction of the courts of the State of Delaware, [or] the court of the United States of America for the District of Delaware."  Further, by receiving the awards, Cabri agreed that he "consent[s] that any such Proceeding may and shall be brought in such courts and waives any objection" that he "may now or thereafter have to the venue or jurisdiction of any such Proceeding in any such court or that such Proceeding was brought in an inconvenient court."  The forum selection clause in the 2018 Plan provides that a "Proceeding" may be "based in contract, tort or otherwise," and that the Proceeding covered by the clause may "aris[e] out of our relat[e] to" the "Plan or any Award Agreement."  The previous 2010 Omnibus Stock and Incentive Plan, both in its original and 2013 amended and restated forms, had the same language.[2]

9.      This proceeding is "based in contract, tort, or otherwise" and "aris[es] out of or relat[es] to" the "Plan or any Award Agreement."  In particular, this proceeding is "based in" both

---

[1]  *See* https://www.sec.gov/Archives/edgar/data/106640/000010664018000027/exb101-41820188xk.htm.

[2]  *See* https://www.sec.gov/Archives/edgar/data/106640/000119312510093439/dex101.htm (2010 Plan); https://www.sec.gov/Archives/edgar/data/106640/000119312513157034/d521058dex101.htm (amended and restated 2010 Plan) (2013).

contract and statutory claims, and it "relates to" the 2018 Plan and previous Plans because Whirlpool is seeking to recover equity and cash incentive awards as well as protect its trade secrets, and the 2018 Plan and previous Plans permit Whirlpool to recover incentive awards when employees like Cabri leave Whirlpool for direct competitors like Haier, and when in Whirlpool's sole judgment the employee's departure is detrimental to Whirlpool and its interests, including by threatening misappropriation of Whirlpool's valuable trade secrets.

**B.  Subject Matter Jurisdiction.**

10.  This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 18 U.S.C. § 1836(c) because Whirlpool brings a claim against Cabri under the federal Defend Trade Secrets Act, codified at 18 U.S.C. § 1836.  This Court has the authority to exercise supplemental jurisdiction over Whirlpool's state law claims.  *See* 28 U.S.C. § 1367(a).

11.  In addition, this Court has subject matter jurisdiction under 28 U.S.C. § 1332 because Whirlpool is a citizen of Delaware and Michigan, Cabri is a citizen of Italy, and the amount in controversy exceeds $75,000.

**C.  Venue.**

12.  Venue is proper in this District because Cabri is "subject to . . . personal jurisdiction" in this District.  *See* 28 U.S.C. § 1391(c)(3).  Further, in connection with the acceptance of his equity awards under the 2018 Plan and the 2010 Plan (in its original and amended and restated forms), Cabri agreed to "waive any objection to the venue . . . of any such Proceeding" in this District.  *See* 28 U.S.C. § 1404(a) (case may be transferred to "any district or division to which all parties have consented").

## FACTUAL ALLEGATIONS

**A.     Whirlpool Develops and Maintains Valuable Trade Secrets Across Its Operations Including For Its Laundry Organization.**

13.     Whirlpool has been a world leader in home appliance innovation for well over a century.  Still today, Whirlpool stands at the vanguard of home appliance innovation.  As most relevant here, Whirlpool has invested heavily across the laundry home appliance products portfolio to fulfill its vision of relentlessly improving life at home.  In particular, Whirlpool has made substantial investments to develop trade secrets in support of the Laundry Organization, many of which also bear on the Cooking Organization.

14.     Cabri possesses detailed and intimate knowledge of Whirlpool trade secrets in the context of the company's laundry product line, including:

- *Innovative product features*:  Trade secrets concerning technical design and development of (i) washer and dryer integration; (ii) alternative washing and drying solutions and offerings; (iii) washer and dryer cleanability solutions; (iv) washer and dryer access solutions; (v) washer and dryer noise reduction solutions; (vi) dryer wrinkle removal solutions; (vii) washers and dryers with connectivity and IOT (Internet of Things) solutions; and (viii) washers and dryers with safety and monitoring solutions.

- *Technical component designs*: Trade secrets concerning technical design and development of (i) washer drums; (ii) washer and dryer automatic measurement and cartridge systems; (iii) dryer lint screens; (iv) dryer heaters and blowers; and (v) washer and dryer pedestals.

- *Consumer insights*:  Trade secrets concerning insights to the (i) needs and desires of Whirlpool's customers; (ii) needs and desires of home appliance consumers; (iii)

what will drive sales; (iv) what will drive margins; (v) what will not drive sales; (vi) what will not drive margins; and (vii) the consumer mechanisms for collection of such insights.

- *Strategic product development*:  Trade secrets concerning Whirlpool's Five Year Plan for the Laundry Organization, including (i) the pre-plan and successive implementation stages and innovative new product and feature developments; (ii) budget allocations for particular products, features, and global regions; (iii) consumer product and service preferences analysis and studies, and offerings by global region; (iv) product and service initiatives by global region; (v) market research and trends by global region; and (vi) branding by global region.

- *Strategies for achieving regulatory requirements*:  Trade secrets concerning (i) regulatory compliance strategies; (ii) regulatory compliance successes; (iii) regulatory compliance challenges and failures; and (iv) regulatory compliance costs.

- *Organization and integration:* Trade secrets concerning (i) internal structural organization; (ii) internal innovation and product development architecture; (iii) internal manufacturing capability and strengths and weaknesses; (iv) internal engineering and manufacturing footprint; (v) internal engineering and manufacturing site placement strategies; (vi) internal manufacturing footprint and product consolidation, integration, and expansion; (vii) internal short-, medium-, and long-term cost centers; (viii) internal talent as well as employees and resources central to institutional knowledge base; and (ix) component suppliers and relationships.

**B.      Whirlpool Takes Extensive Steps To Protect Its Trade Secrets.**

15.      Whirlpool has taken broad steps to protect its valuable trade secrets developed for and utilized by Whirlpool's Laundry Organization as well as by Whirlpool's Cooking Organization.

16.      As one step, Whirlpool promulgates and enforces effective policies that protect its trade secrets.  In this regard, all employees given access to Whirlpool's trade secrets and other confidential and proprietary information, including Cabri, are required to review and affirm both Whirlpool's Code of Ethics and Whirlpool's Global Compliance Policies each year.

17.       As relevant here, the Code of Ethics provides:  "Trade secrets and other proprietary information about Whirlpool, its business activities, and its customers and suppliers, should be treated as confidential.  Except to the extent legally required, such information, or confidential employee data, should not be disclosed to people inside or outside the Company who do not have a legitimate work-related need to know.  Any such disclosure must be made in accordance with Company policies and any applicable law, including all privacy laws relating to the protection and disclosure of personal data.  In addition to the proper use of information, it is important for employees to prevent misuse, disclosure, or destruction (other than in accordance with the appropriate record retention policy) of the information for which they are responsible.  This information may be in printed form, computer based, or stored on microfilm or some other format."

18.      The Code of Ethics was recently integrated into Our Integrity Manual.  As relevant here, Our Integrity Manual provides:  "Our intellectual property is an important asset.  We protect these innovations, brands, and trade secrets and make sure we follow authorization processes before sharing with others."

19.     Referenced within Our Integrity Manual are several of Whirlpool's Global Compliance Policies.   One of those policies, GCP-5, Protection of Confidential Information Policy, provides in relevant part:   "Effectively protecting confidential information relating to all business activity is critical to Whirlpool Corporation's success.   Disclosure of even seemingly unimportant information may be detrimental to Whirlpool employees or business relationships. Confidential information may be in spoken, printed or electronic form.   Some examples of Whirlpool Corporation's confidential information include trade secrets, detailed sales and profit figures, product designs, marketing plans, research and development ideas or information, manufacturing processes, procurement information, and information concerning potential acquisitions, divestitures and investments."

20.     Throughout his time at Whirlpool, Cabri annually reviewed and affirmed the Code of Ethics, and later Our Integrity Manual, as well as Whirlpool's Global Compliance Policies, including GCP-5.   For example, Cabri completed the Annual Certification of Whirlpool's confidentiality policies on February 24, 2021, March 10, 2020, January 28, 2019, January 11, 2018, January 19, 2017, and January 7, 2016.

21.     Whirlpool has taken steps to protect its trade secrets beyond requiring its employees to regularly review and affirm its ethics and compliance policies.   In particular, Whirlpool shares its trade secrets only with those in the company who need to know the trade secrets.   High-level design, development, and production leaders like Cabri have access to a broad array of Whirlpool's trade secrets across multiple product lines.   However, lower-level project leads, managers, and line employees do not.   As a practical example, Whirlpool maintains folder-level restrictions to materials maintained on the company's shared network drives.   To access such shared drives, employees need express permission, and access is only granted, if necessary, for employees to

10

perform their jobs.   Proprietary design plans, manufacturing initiatives, and competitive assessments—documents and materials encompassing Whirlpool's trade secrets—cannot be accessed by ordinary personnel.

22.     Whirlpool also has implemented a wide variety of electronic controls to protect its trade secrets.   For example, Whirlpool requires passwords to access company computers and confidential information.   All repositories of Whirlpool confidential information and trade secrets currently require two-factor authentication. Whirlpool also has created other controls that block unauthorized software installation and certain access to sensitive information.

23.     Whirlpool also has implemented significant physical controls to protect its trade secrets and other confidential and proprietary information.   For example, a Whirlpool key card is required to access all restricted locations within Whirlpool facilities.   Those restricted locations contain Whirlpool's confidential physical files, engineering laboratories, design studios, as well as Whirlpool's electronic servers.   Access is limited to employees whose work responsibilities require access to the restricted locations.

24.     Whirlpool also has a robust policy and practice of marking documents as "confidential" or for "internal use only," including material that will be shown, shared, or displayed to groups of employees, which practice reinforces the company's policies of identifying confidential information that employees cannot share outside of the organization.

25.     Whirlpool also takes steps to protect its trade secrets and other confidential and proprietary information when employees leave the company.   In particular, Whirlpool requires its employees to return all company hardware and software upon their departure, and Whirlpool reminds employees of their ongoing duty to protect Whirlpool's confidential information.

Whirlpool also regularly conducts exit interviews, and takes steps to ensure that it recovers company property from employees who depart, whether voluntarily or involuntarily.

26.     Furthermore, for high-level employees subject to performance-based equity and/or cash incentive awards, Whirlpool conditions the incentive awards on the executive not joining a competitor within two years of departure from Whirlpool, or otherwise taking actions detrimental to Whirlpool.  If a departing employee takes such actions, Whirlpool has the right to recover the awards.  Moreover, these plans require employees like Cabri to protect Whirlpool's trade secrets. For example, the 2018 Omnibus Stock and Incentive Plan explicitly directs that such employees must "protect the confidential information of the Company and its trade secrets . . . ."  These and other measures ensure the protection of Whirlpool's trade secrets.

### C.     Whirlpool Employs Cabri For Over Thirty Years And Eventually Promotes Cabri To Lead Front-Load Laundry and Built-In Cooking.

27.     Whirlpool hired Cabri as a temporary employee in April 1989.  Whirlpool thereafter invested in Cabri, and Cabri acquired new skills and abilities, which he used to rise through ranks of the global Whirlpool organization.   In the 1990s, Cabri held several regional managerial positions during which he came to learn of the nuts and bolts of Whirlpool's business and was involved in implementing strategic plans and objectives.  During the 2000s, Cabri maintained director-level roles largely related to product development for Whirlpool's built-in cooking appliances.  In these roles, Cabri learned about Whirlpool's innovative product design processes and procedures, as well as the consumer study mechanism the company used to evaluate product innovation.  In the early 2010s, Cabri led cross platform product integration and product delivery teams.

28.     Throughout his first twenty-five years with Whirlpool, Cabri received extensive training, mentorship, and resources from Whirlpool.  He developed from an entry-level employee to lead several different Whirlpool platform and product delivery teams.

29.     In March 2018, Whirlpool gave Cabri the opportunity to play a lead role in Whirlpool's global Laundry Organization when it made Cabri the Global Platform Leader for Front-Load Laundry.   Cabri held this role as recently as July 2020.

30.     Cabri's promotion to Global Platform Leader for Front-Load Laundry significantly deepened Cabri's involvement with Whirlpool's management-level global operations.

31.     While in charge of Front-Load Laundry, and starting in July 2020, Built-In Cooking, Cabri regularly interacted with Whirlpool's Michigan-based executive team.  Cabri and his direct reports also interacted with key manufacturing, engineering, and operations leads in Ohio—where Whirlpool maintains the largest number of its approximately 25,000 U.S. employees, including the many employees of its Laundry Organization—and in Tennessee, where Whirlpool maintains Cooking Organization employees and facilities.

32.     In addition, Cabri regularly visited his key Whirlpool internal customers and supporters.  He traveled to Michigan to meet with Whirlpool executives several times each year. He also traveled to Whirlpool facilities to meet with the leaders and operators of Whirlpool's manufacturing, engineering, and operations teams in Ohio.  Many of Whirlpool's employees in Ohio support the Laundry Organization.  For example, Whirlpool has over 3,200 employees supporting its Laundry Organization in its Clyde, Ohio, manufacturing facility, and another 2,200 employees supporting its Laundry Organization in its Marion, Ohio, manufacturing facility.  A photograph of Cabri at Whirlpool's Clyde, Ohio Laundry Organization manufacturing facility commemorates one of Cabri's trips.  *See* Exhibit A.

33.     Not only did Cabri regularly interact with Whirlpool's global leadership, both electronically and physically, his high-level position gave him near complete access to Whirlpool's global resources, including its sensitive corporate strategies, product development plans and designs, and manufacturing and engineering architectures.  These global strategies, plans, designs, and architectures were and are housed in centralized servers located in Michigan, Ohio, Tennessee, and elsewhere throughout the United States.  Cabri both accessed and contributed to that information.

34.     Cabri himself has acknowledged the global nature of the portfolio of products he managed.  Although Cabri has been and remains technically employed by Whirlpool's Italian subsidiary, Whirlpool EMEA S.p.A., Cabri's Linked-In profile at the time of his decision to leave Whirlpool for Haier listed his employer as "Whirlpool Corporation."  *See* Exhibit B.  Cabri's email signature line that he created for himself provides his role at Whirlpool as "Global Platform Leader, Cooking Built-in at Whirlpool Corporation."  *See* Exhibit C.  And Cabri has elsewhere acknowledged that he is an "executive" of "international importance" who "operat[es] in the global market (and in particular in the United States market)."  Cabri, moreover, has recognized that the "high remuneration" Whirlpool pays him "mirror[s]" his "profound knowledge of Whirlpool's corporate organization and its strategy development lines, but in-depth knowledge of the products, production methods, global market and marketing-related issues as well."  Indeed, even after announcing that he would leave for Haier, Cabri contacted Whirlpool Human Resources personnel in Michigan, demonstrating that he is a global Whirlpool employee.  He has continued to have discussions with Michigan-based Human Resources and Technology personnel as he prepares to transition away from Whirlpool.

35.     As the Global Platform Leader for two of Whirlpool's key product lines, Cabri had significant responsibilities.  He managed over 200 engineers and analysts, and at least as many consultants and temporary employees working in areas like electronics, materials, and laboratory research whose workplaces include Ohio, Michigan, Italy, and India.  He oversaw projects and capital expenditures with multimillion dollar budgets.

36.     In addition to his extensive management responsibilities, Cabri also was tasked with developing Five Year Plans for the Laundry Organization and the Cooking Organization.  In connection with that task, Cabri developed and executed Whirlpool's global strategy for each organization, and oversaw all aspects of the product development and delivery roadmaps to drive solutions for each organization, and their various brands in each global region in which Whirlpool operates.

37.     Cabri was the Global Platform Leader for Front-Load Laundry from March 2018 until July 2020.  Even while transitioning to lead the Built-In Cooking, however, Cabri remained involved with the Laundry Organization.   In particular, Cabri continued to assist with implementation of the Front-Load Laundry Five Year Plan, and was available to provide strategic guidance to his successor.  Moreover, Cabri participated extensively in a series of executive-level global strategy assessments and meetings that included the Laundry Organization as late as February 2021.

**D.     Cabri Acquires Extensive Whirlpool Trade Secrets.**

38.     During his time at Whirlpool, but particularly in his role as the Global Platform Leader for Front-Load Laundry, and then as the Global Platform Leader for Built-In Cooking, and in connection with his development of the Five Year Plan for both platforms, Cabri obtained extensive and valuable trade secrets from Whirlpool.

39.    Cabri's high-level position gave him near complete access to the comprehensive and strategic roadmap for all of Whirlpool's global products and product lines and the Five Year Plans for each of them.   He participated in high-level meetings concerning the product development and rollout for all of Whirlpool's various product lines.   And he had unrestricted access to the global computer networks, files, and other data containing Whirlpool's most confidential and sensitive material.

40.    Cabri is especially familiar with Whirlpool's laundry product lines.   Cabri knows which laundry products Whirlpool will release as part of its Five Year Plan, when Whirlpool plans to release those products, the new features those products will have, how those new features will differentiate the product from competing products, the design challenges implicated by those new products and the associated features, how those challenges were overcome, and the ways in which Whirlpool plans to address similar challenges in future products.

41.    Cabri also understands the underlying technologies that support and will support Whirlpool's laundry products.   Both as regards traditional product development and appliance connectivity solutions, Cabri has been deeply involved in the technical side of Whirlpool's product strategy.

42.    Cabri has helped develop Whirlpool's patents, overseen Whirlpool's patent prosecution strategy, and directed research and development objectives and allocations.   Cabri himself is named as an inventor on several patents assigned to Whirlpool.

43.    Not only does Cabri understand where and why Whirlpool plans to win future market share with new and innovative products and technologies, he also knows the strategic challenges faced by Whirlpool in the product space and understands Whirlpool's intellectual property risks and liabilities.

44.     Cabri, in short, knows everything there is to know about Whirlpool's near- and medium- term laundry platform product plans and technologies.  More to the point, he was a chief architect of those plans and technologies.

45.     Beyond product- and marketing-based trade secrets, Cabri also understands the internal structure of the Laundry Organization, how it obtains research capital, how it spends that capital, and how it allocates that capital by global region.

46.     He also knows where the Laundry Organization plans to dedicate resources as part of its Five Year Plan, the cost, revenue, and profit picture for the Laundry Organization, as well as the strategic competitive and regulatory risks and challenges faced by the Laundry Organization.

47.     Cabri also is deeply familiar with the physical supply chain and manufacturing footprint of the Laundry Organization.  He knows which factories, relationships, and networks are critical, where Whirlpool needs to expand its footprint, where it may minimize or consolidate its physical footprint in the future.

48.     Cabri also is intimately familiar with Whirlpool's laundry brand organization, brand consolidation, and marketing strategies concerning global and regional sub-brands. Cabri was, in fact, intimately involved in Whirlpool's integration of products and brands of the companies that Whirlpool acquired in the laundry space.

49.     Cabri accordingly has in his possession the trade secrets mentioned in the preceding paragraphs concerning the Laundry Organization, along with similar trade secrets concerning the Cooking Organization.

E.      **Whirlpool Provides Significant Incentive Awards To Cabri.**

50.      In recent years, Whirlpool has provided significant incentive awards to Cabri in connection with his role as the head of Whirlpool's key global products organizations.  Cabri's incentive structure includes both equity and cash bonus awards.

51.      Certain equity and cash incentive awards Cabri received are subject to Whirlpool's 2018 Omnibus Stock and Incentive Plan and previous similar Plans.  As relevant here, the 2018 Plan provides:  "[A]ny Participant may be required to repay the Company an Award, . . . (ii) if the Participant becomes employed with a competitor within the two year period following termination, or (iii) for any other reason considered by the [Human Resources Committee of the Board of Directors] in its sole discretion to be detrimental to the Company or its interests."[3]  The earlier Plans contained similar provisions.

52.      Other cash incentive awards Cabri received are subject to Whirlpool's 2014 Performance Excellence Plan ("PEP") and previous similar Plans.[4]  As relevant here, the 2014 Plan provides:  "Any Participant who would otherwise be eligible for an award pursuant to a completed Plan Year shall not be entitled to any payment under that award, and shall be required to repay the Company any payment of such award, if . . . (ii) the Participant becomes employed with a competitor within the two year period following termination, or for any other reason considered by the [Chief Executive Officer and Senior Vice President, Global Human Resources

---

[3]  *See* https://www.sec.gov/Archives/edgar/data/106640/000010664018000027/exb101-41820188xk.htm.

[4]  *See* https://www.sec.gov/Archives/edgar/data/106640/000010664014000021/exb10iiia-3312014.htm (2014 Plan); https://www.sec.gov/Archives/edgar/data/106640/00011931250908567/dex101.htm (2009 Plan); https://www.sec.gov/Archives/edgar/data/106640/000119312504039122/ddef14a.htm#toc35999_25 (2004 Plan).

or such other Committee as Whirlpool establishes] in its sole discretion to be detrimental to the Company or its interests."  Earlier PEP plans contained identical or similar provisions.

**F.      After Aggressive Solicitation By Haier, Cabri Decides To Leave Whirlpool And Take A Nearly Identical Position At Haier.**

53.      Upon information and belief, Haier began to aggressively solicit and recruit Cabri at least as early as January 2021, if not before.  In the ensuing four months, Haier persistently lobbied Cabri to leave his role at Whirlpool and accept a similar position at Haier.

54.      In April 2021, Cabri informed Whirlpool that he had accepted Haier's offer of employment.  At first, Cabri only told Whirlpool that he was leaving the company.  He declined to reveal his plans following his departure from Whirlpool.  Only after several direct conversations did Cabri disclose to Whirlpool that he was leaving the company to take a position at Haier running that company's laundry organization.

55.      Upon learning of Haier's offer of employment to Cabri, Whirlpool offered Cabri significant incentives to remain a key member of Whirlpool's leadership team.  Cabri declined Whirlpool's offers.  On information and belief, Whirlpool alleges that Cabri declined Whirlpool's offer because Haier has offered him an even greater compensation package and that such a lucrative offer from Haier does not make economic sense and in fact demonstrates that Haier is hiring and paying Cabri for the access he will provide to Whirlpool's trade secrets.

56.      On May 3, 2021, Whirlpool sent a letter to one of Haier's executives in China advising Haier of the serious problems posed by Haier's decision to extend employment to Cabri. As Whirlpool relayed, Cabri's prospective role with Haier "significantly overlaps with his previous Whirlpool roles," making it impossible for Cabri to work for Haier "without using his insider's knowledge of Whirlpool's confidential information."  *See* Exhibit D.  Whirlpool received no response to its letter.

57.     On May 7, 2021, Whirlpool, through legal counsel, sent a letter to a senior legal official within Haier's European organization, reiterating the serious problems posed by Haier's decision to employ Cabri.  In particular, Whirlpool highlighted again that Cabri would be unable to perform his prospective role at Haier without misappropriating Whirlpool's trade secrets.  *See* Exhibit E.

58.     On May 24, 2021, Haier responded to Whirlpool's May 7, 2021 letter.  Haier stated in its letter that it would not direct Cabri to divulge Whirlpool's trade secrets to Haier.  At the same time, however, Haier admitted that it had hired Cabri precisely because he was a "valued individual with expertise."  *See* Exhibit F.  Cabri's expertise, however, is founded on 32 years of intimate involvement in the development of Whirlpool's trade secrets, corporate strategies, and other confidential and proprietary information.

59.     In accord with Italian employment law, Cabri remains a Whirlpool employee and should remain a Whirlpool employee for the remainder of his required four-month notice period, unless Cabri terminates his employment sooner.  That period is set to end in August 2021.

60.     At present, Cabri remains committed to leaving for Haier at the end of his four-month notice period.  Whirlpool has accordingly assigned Cabri to various transitional tasks that do not create further risks to Whirlpool.

### G.     Cabri Refuses To Return Amounts Owed To Whirlpool.

61.      Given Cabri's decision to leave for Haier, Whirlpool formally notified Cabri that he owed the company €1,047,596.32 in previously issued conditional equity and cash incentive awards.  Whirlpool explained in its notice that it had decided to recover the amounts issued "because of [Cabri's] employment with a competitor of Whirlpool (Haier) and also because [Cabri's] conduct has been determined to be detrimental to the Company and its interests,"

including because Cabri's decision to join Haier "will be placing at risk Whirlpool's confidential information and trade secrets."

62.     Whirlpool demanded that Cabri acknowledge his obligation to repay the value of the incentive awards he received, indicating that his failure to do so would be deemed a refusal to make the payment due.  Cabri failed to provide the necessary acknowledgement and has effectively refused to pay Whirlpool the amounts he owes to Whirlpool for the equity and cash incentive awards he received.

### H.     Cabri Threatens To Misappropriate Whirlpool's Valuable Trade Secrets By Disclosing Them To Haier And Using Them For Haier's Benefit.

63.     Should Cabri begin employment at Haier, Cabri will misappropriate the trade secrets enumerated above as well as similar trade secrets.  In particular, Cabri's decision to begin employment at Haier threatens imminent misappropriation for at least three reasons:

- Logic of inevitable disclosure

- Lack of transparency and engagement from Cabri

- Indicia of untrustworthiness from Haier

64.     **Logic of inevitable disclosure.**  It is impossible that Cabri will be able to play a leading role in Haier's laundry division without using and disclosing the trade secrets he acquired while serving as the Global Platform Leader for Front-Load Laundry and continued to have access to as the Global Platform Leader for Built-In Cooking.  Simply put, every skill, experience, and insight Cabri has in his possession was acquired during his thirty-two years at Whirlpool.  These skills, experiences, and insights include and rest upon many of Whirlpool's valuable trade secrets.

65.     Those trade secrets are highly valuable.  Whirlpool invested significant time and resources to develop them.  The trade secrets are also technical in nature.  They include proprietary product designs, provisional patents, and manufacturing architectures.  And the trade secrets are

sensitive and timely. Many of the trade secrets pertain to the Five Year Plan for Front-Load Laundry—a plan that Whirlpool presently is implementing globally to directly compete with Haier and other home appliance makers. Cabri himself helped develop the plan and was involved in strategy assessments and initiatives concerning the plan as late as February 2021. On information and belief, Cabri already had decided to accept a position at Haier by that date. The loss of the trade secrets would pose a serious threat to Whirlpool's Laundry Organization and to Whirlpool more generally.

66.     Cabri will not be able to perform his role at Haier without misappropriating Whirlpool's trade secrets. On information and belief, Cabri will take an executive role in Haier's laundry division. This role will be substantially similar to Cabri's role as head of Whirlpool's Laundry Organization. On information and belief, Cabri's compensation and incentive awards at Haier will be tied to growth in market share and other sales targets. In many global regions, Whirlpool is the industry leader for laundry products. To succeed in his role at Haier, and to gain market share for Haier, Cabri therefore will need to develop and execute strategies for Haier to take market share from Whirlpool. It is inevitable that Cabri will rely on his knowledge of Whirlpool's trade secrets to take these steps. For example, Cabri will recommend that Haier develop products or features to compete with Whirlpool, he will push Haier to invest resources in a product or region in which he knows Whirlpool is not well positioned to effectively compete, and he will direct Haier not to pursue products or regions that he knows are unlikely to generate significant profits based on information learned at Whirlpool. In sum, by working for Haier, Cabri will inevitably disclose Whirlpool's trade secrets to Haier—a principal global competitor in the home appliance industry generally, and in the laundry home appliance industry particularly.

67.     **Lack of transparency and engagement from Cabri.**  Cabri's lack of transparency about his decision to leave for Haier is further evidence of threatened misappropriation of Whirlpool's trade secrets by Cabri.  When Cabri first informed Whirlpool that he was leaving the company, Cabri refused to disclose his future plans to Whirlpool.  Only after several hard and very direct conversations did Cabri reluctantly reveal that he had accepted a similar position at Haier.  In subsequent conversations with Whirlpool, Cabri has been extremely unforthcoming in offering additional details concerning his decision to leave for Haier.

68.     Cabri's provision of only the most basic description of his responsibilities with Haier's laundry division confirms that those responsibilities will directly implicate Whirlpool's trade secrets.

69.     So, too, has Cabri failed to engage with Whirlpool's legitimate concerns regarding its trade secrets.  Cabri remains employed by Whirlpool and Whirlpool has directed Cabri to perform various transition tasks relevant to the preservation of Whirlpool's corporate strategies and trade secrets, but Cabri has either failed to perform those tasks or performed them in a cursory manner.  Cabri's cursory performance is consistent with his refusal to acknowledge how his employment with Haier jeopardizes Whirlpool's trade secrets.

70.     **Indicia of untrustworthiness from Haier.**  Not only does Whirlpool have reason to doubt that Cabri will take his duty to protect Whirlpool's trade secrets seriously, it also has significant reasons to mistrust Haier.  Haier is based in the People's Republic of China.  On information and belief, the company began in the 1980s after a state-owned refrigerator factory obtained refrigeration technology from a German company called Liebherr Haushaltgerate.  That factory later changed its name to Haier to reflect the Chinese rendering of Liebherr as Liberhaier.  In subsequent decades, Haier expanded rapidly within China and then moved beyond the Chinese

mainland.  Haier has accelerated its global growth by purchasing other home appliance makers.  For example, Haier purchased historic New Zealand appliance maker Fischer & Paykel in 2012.  It purchased longtime American appliance maker GE Appliances in 2016.  And it purchased storied Italian appliance maker Candy in 2019.  Although Haier has grown immensely in recent years, it remains state-owned to this day.[5]  Haier's Chairman and CEO, Zhang Ruimin, is a Member of the Chinese Communist Party.  He boasts several elections as an alternate member of the Communist Party's Central Committee—on information and belief, the top political body of the Party comprised of only a few hundred leading Party members.[6]

71.    In the last decade, entities with ties to the Chinese Communist Party have engaged in rampant theft of American intellectual property.  Much of this illegal expropriation has been directed at American product and technology companies and their valuable trade secrets.  In fact, the United States Department of Justice estimates that 80% of all economic espionage prosecutions brought by the Justice Department "allege conduct that would benefit" the People's Republic of China, and that there is "some nexus to China" in approximately 60% of all trade secret theft cases.[7]  The problem has become so acute that the Justice Department has developed a "China Initiative" aimed at protecting American companies and their intellectual property from ongoing

---

[5]  *See* https://www.wsj.com/articles/ge-deal-gives-chinas-haier-long-sought-overseas-foothold-1452904339.

[6]  *See* https://www.haier.com/global/about-haier/ceo/?spm=net.31999_pc.header_141693_20200720.2.

[7]  *See* https://www.justice.gov/nsd/information-about-department-justice-s-china-initiative-and-compilation-china-related.

theft by the People's Republic of China, associated companies, and their individual operatives.[8]
The Justice Department's China Initiative continues to result in regular charges[9] and convictions.[10]

72.     Haier itself has been implicated in the theft of trade secrets developed and owned
by American companies.  A Haier entity was a named defendant in *CYBERsitter, LLC v. People's
Republic of China*, *et al.*, No. CV 10–00038–JST, a suit filed in the United States District Court
for the Central District of California.  The plaintiff alleged that the People's Republic of China
itself, along with various entities, including a Haier entity, conspired to and in fact did intentionally
misappropriate the plaintiff's proprietary software code by disseminating that code throughout the
People's Republic of China.  *See* 805 F. Supp. 2d 958, 969 (C.D. Cal. 2011).  The Haier entity
defended against the suit by arguing that the People's Republic of China—which on information
and belief controls Haier—was an indispensable party, but could not be subject to suit in light of
its sovereign immunity.  *See id.* at 974–77.

73.     In addition to general concerns about Haier's connection to the Chinese Communist
Party, Whirlpool has particular reason to believe that Haier has been targeting Whirlpool's trade
secrets.  In a significant respect, Haier's actions vis-a-vis Whirlpool are nothing new.  Years ago,
when Haier was a much smaller player outside China, Haier marketed an appliance at a trade show
that appeared to be based on the reverse engineering of Whirlpool's own product, including even
the specific Whirlpool part numbers.

---

[8]  *See id.*

[9]  *See* https://www.justice.gov/opa/pr/chinese-businessman-charged-conspiring-steal-trade-secrets.

[10]  *See* https://www.justice.gov/opa/pr/phd-chemist-convicted-conspiracy-steal-trade-secrets-economic-espionage-theft-trade-secrets.

74.     But Haier's attempts to acquire Whirlpool's innovations and technologies has become more aggressive in recent years.

75.     In 2015, Haier picked long-time Whirlpool executive Yannick Fierling to lead its at-that-point relatively modest European operations.

76.     Haier also established an Industrial Design Center in Italy near Whirlpool's Italian (and European) headquarters.  The proximity of Haier's research center gave, and continues to give, Whirlpool cause for concern.

77.     In October 2018, Haier announced that it would acquire historic Italian appliance maker, Candy.  Haier completed the acquisition of Candy a few months later, in early 2019.  Of course, Haier is entitled to engage in merger activity.  But, since the acquisition announcement, Haier (directly or through Candy) has recruited over a dozen additional Whirlpool managers, project leaders, or directors to join its Italian or European business operations.  With each former Whirlpool employee, Haier has learned more about Whirlpool's products, operations, and strategies.  Haier's decision (through a Candy subsidiary) to offer employment to Cabri is simply the most significant action in a long line of actions that demonstrates an intent by Haier to gain market share by the pirating from—or at least the parroting of—Whirlpool, rather than by internal ingenuity.  That action has continued up to the present.  In the weeks since Cabri announced his intention to leave Whirlpool, other Whirlpool engineers and analysts have also announced their departure.  Whirlpool is informed and believes at least some of these employees will transfer to Haier (or Candy) and take positions substantially similar to their positions at Whirlpool.

78.     In sum, in light of the People's Republic of China's history of intellectual property misappropriation and theft of trade secrets, the ways in which Haier is implicated in that history, and Haier's aggressive actions regarding Whirlpool's Italian and European operations, Whirlpool

reasonably has concluded that Haier will pressure Cabri—explicitly or implicitly—to divulge Whirlpool's trade secrets as soon as Cabri steps into a lead role in Haier's laundry organization. Indeed, it would be naïve for Whirlpool to expect anything else.

79.     Taken together, these factors—the logic of inevitable disclosure, Cabri's lack of transparency and engagement, and Haier's indicia of trustworthiness—undeniably establish a serious threat of trade secrets misappropriation.

## CAUSES OF ACTION

### Count 1 – Breach of Contract
### (Conditional Equity and Cash Incentive Awards)

80.     Whirlpool incorporates by reference all preceding paragraphs.

81.     During the last several years at Whirlpool, and in connection with his role as a top Whirlpool executive, Cabri received significant equity and cash incentive awards.

82.     Such equity and cash awards were issued under Award Agreements made pursuant to Whirlpool's 2018 Omnibus Stock and Incentive Plan and similar previous Plans, including the 2010 Omnibus Stock and Incentive Plan both in its original and amended and restated form.

83.     The Award Agreements are enforceable contracts.

84.     The equity and cash incentive awards Cabri received through the Award Agreements were made subject to express conditions.  The conditions include that the employee "may be required to repay" Whirlpool the award if the employee "becomes employed with a competitor within the two year period following termination" of employment with Whirlpool or "for any other reason considered by the [Human Resources Committee of the Whirlpool Board] in its sole discretion to be detrimental to Whirlpool or its interests."

85.     On June 14, 2021, the Human Resource Committee of the Whirlpool Board delegated to a specially formulated Whirlpool Management Committee the authority to decide

whether and what amount of Cabri's previous equity and cash incentive awards should be recovered.  On June 23, 2021, this Management Committee determined that, in light of Cabri's decision to take a nearly identical role at a direct competitor immediately following his termination from Whirlpool, and in light of the fact that Cabri's decision threatened the imminent misappropriation of Whirlpool's valuable trade secrets, the conditions were met for requiring Cabri to repay the equity and cash incentive awards Cabri had received.  Thus, the determination was made that Whirlpool would recover the value of Cabri's equity and cash incentive awards, totaling €473,891.39.

86.     Whirlpool informed Cabri of the decision to require his repayment of the value of the incentive awards he received and required that Cabri confirm his commitment to repay the amounts owed.  Whirlpool informed Cabri that his failure to confirm a commitment to repay the amounts would constitute a refusal to repay.  Cabri refused to confirm his obligation and commitment to repay the sums owed.

87.     Cabri accordingly has breached the Award Agreements.

88.     Cabri's breach of the Award Agreements has injured Whirlpool in the amount of €473,891.39 and in other ways and amounts to be proved at trial.

### Count 2 – Breach of Contract
### (Conditional PEP Bonus Awards)

89.     Whirlpool incorporates by reference all preceding paragraphs.

90.     During the last several years at Whirlpool, and in connection with his role as a top Whirlpool executive, Cabri received significant cash bonus awards.

91.     These bonus awards were issued pursuant to Whirlpool's 2014 Performance Excellence Plan ("PEP") and similar previous PEP Plans, including the 2009 Performance Excellence Plan and the 2004 Performance Excellence Plan.

92.     The 2014 Plan, 2009 Plan, and 2004 Plan are enforceable contracts.

93.     The PEP bonus awards Cabri received were made subject to express conditions. The conditions include that the employee "shall be required to repay" Whirlpool the award if the employee "becomes employed with a competitor within the two year period following termination" of employment with Whirlpool or "for any other reason considered by the [Chief Executive Officer and Senior Vice President, Global Human Resources or such other Committee as Whirlpool establishes] in its sole discretion to be detrimental to the Company or its interests."

94.     On June 23, 2021, the Chief Executive Officer and Senior Vice President, Global Human Resources, determined that, in light of Cabri's decision to take a nearly identical role at a direct competitor immediately following his termination from Whirlpool, and in light of the fact that Cabri's decision threatened the imminent misappropriation of Whirlpool's valuable trade secrets, the conditions were met for requiring Cabri to repay the PEP bonuses he had received. Thus, the determination was made that Whirlpool would recover the value of Cabri's PEP bonus awards, totaling €573,704.93.

95.     Whirlpool informed Cabri of the decision to require his repayment of the value of the PEP bonus awards he received and required that Cabri confirm his commitment to repay the amounts owed.  Whirlpool informed Cabri that his failure to confirm a commitment to repay the amounts would constitute a refusal to repay.  Cabri refused to confirm his obligation and commitment to repay the sums owed.

96.     Cabri accordingly has breached the 2014 PEP Plan and previous similar PEP plans, including the 2009 PEP Plan and the 2004 PEP Plan.

97.     Cabri's breach has injured Whirlpool in the amount of €573,704.93 and in other ways and amounts to be proved at trial.

## Count 3 – Trade Secrets Misappropriation
## Defend Trade Secrets Act, 18 U.S.C. § 1836

98.     Whirlpool incorporates by reference all preceding paragraphs.

99.     Whirlpool's trade secrets consist of product plans, product features, product assessments, product designs, product testing, product marketing, and other related proprietary information pertinent to Whirlpool's products and product strategy in respect of its Laundry Organization, Cooking Organization, the rest of Whirlpool's global business operations, as well as those trade secrets identified in the preceding paragraphs of this Complaint.  Whirlpool's trade secrets also consist of organizational plans, organizational schematics, organizational assessments, organizational divisions, and other related proprietary information pertinent to Whirlpool's organization and organizational strategy in respect of its Laundry Organization, Cooking Organization, and the rest of Whirlpool's global business operations.  These trade secrets are timely, sensitive, strategic, and technical.

100.    This information qualifies as trade secret information because it is non-public and derives economic value from the fact that it is not generally known to the public or to the home appliance industry, and Whirlpool takes reasonable steps to maintain the secrecy of the information.  In particular, Whirlpool has invested significant time and resources in developing its trade secrets.  Whirlpool made these investments because Whirlpool uses the trade secrets to compete in the laundry appliance industry, the cooking appliance industry, and other home appliance market segments.  Should the trade secrets become public or available to a competitor, they will lose their value to Whirlpool.  Because of the value of the trade secrets, Whirlpool has made and continues to make extensive efforts to maintain the confidentiality of the trade secrets.  Whirlpool directs its employees to affirm confidentiality provisions, limits access to the trade secrets, and otherwise implements electronic and physical barriers to protect the trade secrets.

101.    Cabri acquired Whirlpool's trade secrets—including its product and organizational trade secrets—in connection with his employment with Whirlpool, and in particular as part of his role as Global Platform Leader for Front-Load Laundry and the Global Platform Leader for Built-In Cooking.  Cabri acquired the trade secrets under a duty to limit their use and maintain their secrecy.

102.    Because Cabri has indicated he plans to follow through on his plan to leave Whirlpool for Haier, he will misappropriate or already has misappropriated Whirlpool's trade secrets by wrongfully acquiring them, using them in his employment at Haier, and divulging them to other employees at Haier.  The  disclosure of Whirlpool's trade secrets is inevitable given (1) the intense—and growing—competition between Whirlpool and Haier in the laundry home appliance industry and in the home appliance industry more generally; (2) the near complete overlap between Cabri's former role at the head of Whirlpool's Laundry Organization and his prospective role as a leader of Haier's laundry division, such that Cabri will be unable to compartmentalize Whirlpool's trade secrets from his other general knowledge and experience; and (3) the strong likelihood that Haier, Cabri's prospective new employer, will take little or no action to ensure that Cabri does not divulge Whirlpool's trade secrets—and in fact likely will order or at least nudge Cabri to do so for the reasons already explained.  *See W.L. Gore & Assocs., Inc. v. Wu*, No. CIV.A. 263-N, 2006 WL 2692584, at *14 (Del. Ch. Sept. 15, 2006), *aff'd*, 918 A.2d 1171 (Del. 2007) (granting injunction in part because "there exists a substantial likelihood of 'inevitable disclosure' of [employer] trade secrets if [employee] is allowed to work with [the technology]. [Employee] cannot 'unlearn' what he learned while working at [former employer].  If he is allowed to work with [the technology], his extensive knowledge would almost certainly filter into his work and result in disclosure of [former employer] trade secrets"); *Am. Hoechst Corp v. Nuodex, Inc.*,

No. 7950, 1985 WL 11563, at *3 (Del. Ch. Apr. 23, 1985) ("Injunctions have been granted to protect former employers when an employee has taken a job with a competitor, the nature of which will demand that the employee disclose and use trade secrets of the former employer regardless of the employee's intent so to disclose or to make use of the trade secrets."); *Freedom Med. Inc. v. Whitman*, 343 F. Supp. 3d 509, 518 (E.D. Pa. 2018) (collecting decisions noting that analysis for an injunction under the federal Defend Trade Secrets Act and a state Uniform Trade Secrets Act is "the same").

103.    Cabri's use of Whirlpool's trade secrets in connection with this employment at Haier, and his disclosure of those trade secrets to Haier—Whirlpool's direct competitor—is and will be without Whirlpool's express or implied consent.

104.    Cabri's unauthorized use of Whirlpool's trade secrets poses a serious threat to Whirlpool's business.

105.    By reason of Cabri's improper and illegal use and disclosure of Whirlpool's trade secrets, Whirlpool will suffer damages to its business, loss of sales, loss of profits, loss of competitive advantage, and loss of corporate property.  In addition, Haier and Cabri will be unjustly enriched by reason of Cabri's improper and illegal use and disclosure of Whirlpool's trade secrets.

106.    By reason of Cabri's improper and illegal use and disclosure of Whirlpool's trade secrets, Whirlpool will suffer irreparable harm that cannot be adequately remedied at law unless Cabri is enjoined from beginning his employment at Haier.

107.    Whirlpool also is entitled to recover exemplary damages and its attorneys' fees and costs.

**Count 4 – Trade Secrets Misappropriation**
**Delaware Uniform Trade Secrets Act, 6 *Del. C.* § 2001 et seq.**

108.    Whirlpool incorporates by reference all preceding paragraphs.

109.    Whirlpool's trade secrets consist of product plans, product features, product assessments, product designs, product testing, product marketing, and other related proprietary information pertinent to Whirlpool's products and product strategy in respect of its Laundry Organization, Cooking Organization, the rest of Whirlpool's global business operations, as well as those trade secrets previously identified in the preceding paragraphs of this Complaint. Whirlpool's trade secrets also consist of organizational plans, organizational schematics, organizational assessments, organizational divisions, and other related proprietary information pertinent to Whirlpool's organization and organizational strategy in respect of its Laundry Organization, Cooking Organization, and the rest of Whirlpool's global business operations. These trade secrets are timely, sensitive, strategic, and technical.

110.    This information qualifies as trade secret information because it is non-public and derives economic value from the fact that it is not generally known to the public or to the home appliance industry, and Whirlpool takes reasonable steps to maintain the secrecy of the information.  In particular, Whirlpool has invested significant time and resources in developing its trade secrets.  Whirlpool made these investments because Whirlpool uses the trade secrets to compete in the laundry industry, the cooking industry, and other home appliance market segments. Should the trade secrets become public or available to a competitor, they will lose their value to Whirlpool.  Because of the value of the trade secrets, Whirlpool has made and continues to make extensive efforts to maintain the confidentiality of the trade secrets.  Whirlpool directs its employees to affirm confidentiality provisions, limits access to the trade secrets, and otherwise implements electronic and physical barriers to protect the trade secrets.

111.    Cabri acquired Whirlpool's trade secrets—including its product and organizational trade secrets—in connection with his employment with Whirlpool, and in particular as part of his role as Global Platform Leader for Front-Load Laundry and the Global Platform Leader for Built-In Cooking.  Cabri acquired the trade secrets under a duty to limit their use and maintain their secrecy.

112.    Because Cabri has indicated he plans to follow through on his plan to leave Whirlpool for Haier, he will misappropriate or already has misappropriated Whirlpool's trade secrets by wrongfully acquiring them, using them in his employment at Haier, and divulging them to other employees at Haier.  The  disclosure of Whirlpool's trade secrets is inevitable given (1) the intense—and growing—competition between Whirlpool and Haier in the laundry home appliance industry and in the home appliance industry more generally; (2) the near complete overlap between Cabri's former role at the head of Whirlpool's Laundry Organization and his prospective role as a leader of Haier's laundry division, such that Cabri will be unable to compartmentalize Whirlpool's trade secrets from his other general knowledge and experience; and (3) the strong likelihood that Haier, Cabri's prospective new employer, will take little or no action to ensure that Cabri does not divulge Whirlpool's trade secrets—and in fact likely will order or at least nudge Cabri to do so for the reasons already explained.  *See W.L. Gore & Assocs., Inc. v. Wu*, No. CIV.A. 263-N, 2006 WL 2692584, at *14 (Del. Ch. Sept. 15, 2006), *aff'd*, 918 A.2d 1171 (Del. 2007) (granting injunction in part because "there exists a substantial likelihood of 'inevitable disclosure' of [employer] trade secrets if [employee] is allowed to work with [the technology]. [Employee] cannot 'unlearn' what he learned while working at [former employer].  If he is allowed to work with [the technology], his extensive knowledge would almost certainly filter into his work and result in disclosure of [former employer] trade secrets"); *Am. Hoechst Corp v. Nuodex, Inc.*,

No. 7950, 1985 WL 11563, at *3 (Del. Ch. Apr. 23, 1985) ("Injunctions have been granted to protect former employers when an employee has taken a job with a competitor, the nature of which will demand that the employee disclose and use trade secrets of the former employer regardless of the employee's intent so to disclose or to make use of the trade secrets.").

113.    Cabri's use of Whirlpool's trade secrets in connection with this employment at Haier, and his disclosure of those trade secrets to Haier—Whirlpool's direct competitor—is and will be without Whirlpool's express or implied consent.

114.    Cabri's unauthorized use of Whirlpool's trade secrets poses a serious threat to Whirlpool's business.

115.    By reason of Cabri's improper and illegal use and disclosure of Whirlpool's trade secrets, Whirlpool will suffer damages to its business, loss of sales, loss of profits, loss of competitive advantage, and loss of corporate property.  In addition, Haier and Cabri will be unjustly enriched by reason of Cabri's improper and illegal use and disclosure of Whirlpool's trade secrets.

116.    By reason of Cabri's improper and illegal use and disclosure of Whirlpool's trade secrets, Whirlpool will suffer irreparable harm that cannot be adequately remedied at law unless Cabri is enjoined from beginning his employment at Haier.

117.    Whirlpool also is entitled to recover exemplary damages and its attorneys' fees and costs.

### PRAYER FOR RELIEF

118.    Whirlpool respectfully requests that the Court enter an order:

      a.    Declaring that Cabri has breached his contracts with Whirlpool by failing to repay Whirlpool the equity and cash incentive awards and PEP bonuses

he previously received and entering judgment in Whirlpool's favor for such amounts, plus prejudgment interest;

b.  Declaring that Cabri has misappropriated or has threatened to misappropriate Whirlpool's trade secrets;

c.  Preliminarily and permanently enjoining Cabri from misappropriating Whirlpool's trade secrets and issuing other related orders in service of the protection of Whirlpool's trade secrets;

d.  Awarding damages for breach of contract to be proven at trial;

e.  Awarding damages (including actual damages, unjust enrichment, and exemplary damages) for misappropriation to be proven at trial;

f.  Awarding pre- and post-judgment interest;

g.  Awarding attorneys' fees and costs;

h.  And granting such other and further relief as the Court deems appropriate and just.

## JURY DEMAND

Whirlpool demands a trial by jury on all issues so triable.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ John A. Sensing*
    John A. Sensing (#5232)

Steven M. Zadravecz
    Bindu A. Palapura (#5370)
JONES DAY
    Jesse L. Noa (#5973)
3161 Michelson Drive, Suite 800
    Hercules Plaza, 6th Floor
Irvine, CA  92612
    1313 N. Market Street
Tel:  (949) 851-4408
    Wilmington, DE  19801
    Tel:  (302) 984-6000
Joseph W. Hammell
    jsensing@potteranderson.com
JONES DAY
    bpalapura@potteranderson.com
90 South Seventh Street, Suite 4950
    jnoa@potteranderson.com
Minneapolis, MN  55402
Tel:  (612) 217-8800

*Attorneys for Plaintiff Whirlpool Corporation*

Dated:  July 1, 2021
7284161 / 52006

37